**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF SOUTH CAROLINA**
**ROCK HILL DIVISION**

| | | |
|---|---|---|
| Lauren Massey West, | ) | Civil Action No.: 0:20-cv-01952-JMC |
| | ) | |
| Plaintiff, | ) | |
| v. | ) | |
| | ) | **ORDER AND OPINION** |
| Rock Hill School District Three, | ) | |
| | ) | |
| Defendant. | ) | |
| ⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯ | ) | |

Plaintiff Lauren Massey West filed this action against her former employer, Defendant Rock Hill School District Three ("Defendant" or the "District"), alleging claims of discrimination and retaliation based on her sex in violation of Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. §§ 2000e–2000e-17. (ECF No. 1-1 at 7 ¶ 33–9 ¶ 45.)

This matter is before the court on Defendant's Motion for Summary Judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure. (ECF No. 29.) In accordance with 28 U.S.C. § 636(b) and Local Rule 73.02(B)(2)(g) (D.S.C.), this matter was referred to a United States Magistrate Judge for pretrial handling. On December 17, 2021, the Magistrate Judge issued a Report and Recommendation in which she recommended that the court grant Defendant's Motion for Summary Judgment on Plaintiff's claims. (ECF No. 48 at 42.) Plaintiff filed Objections to the Report and Recommendation, which are presently before the court. (ECF No. 52.) For the reasons set forth below, the court **REJECTS** the Magistrate Judge's recommendation, **SUSTAINS** Plaintiff's objections, and **DENIES** Defendant's Motion for Summary Judgment.

## I.    RELEVANT BACKGROUND TO PENDING MOTION

The facts of this matter are discussed in the Report and Recommendation. (*See* ECF No. 48 at 1–13.) The court concludes, upon its own careful review of the record, that the Magistrate

Judge's factual summation is accurate and incorporates it by reference. The court will only reference herein facts that are pertinent to the analysis of the parties' dispute.

Defendant is "the second largest school district in York County," South Carolina and has school "campuses [that] cover more than 3.5 million square feet of facilities and 1,200 acres of land." *Rock Hill Schools York County District Three*, https://www.rock-hill.k12.sc.us/domain/83 (last visited Mar. 24, 2022). Defendant consists of "24 schools -- 1 preschool, 14 elementaries, 5 middle, 3 high, 1 career/technology center" and employs "[a]pproximately 2,400 employees including 1,340 teachers, 105 administrators, [and] 855 other support staff." *Id.* Employees of Defendant work subject to the Policy GBEA Staff Code of Ethics (the "GBEA Policy"), which "establish[es] the basic structure for ethical conduct and the avoidance of conflicts of interest on the part of the district staff." (ECF No. 29-3 at 223.) The GBEA Policy contains a "Nepotism" provision that provides in relevant part:

> S.C. Code Ann. Section 8-13-750 of the South Carolina Ethics Act provides that **no** board member or **public employee may cause the employment, appointment, promotion, transfer, or advancement of a family member to a position in the district to which the board member or public employee supervises or manages**. Similarly, **no** board member or **public employee** may participate in an action related to the discipline of the board member's or public employee's family member.
>
> **"Family member," as referenced in this policy, includes the** board member's or **public employee's spouse**, parent, brother, sister, **child**, mother-in-law, father-in-law, son-in-law, daughter-in-law, brother-in-law, sister-in-law, grandparent, or grandchild [S.C. Code Ann. Section 8-13-100(15)]. The board further includes in this definition of "family member" an individual claimed by a board member or the board member's spouse as a dependent for income tax purposes.
>
> . . .
>
> **The district will not place an employee in a position wherein an employee will exercise direct administrative or supervisory authority over a member of his/her family**.

(ECF No. 29-3 at 223 (emphasis added).) The GBEA Policy also references South Carolina Ethics

Law including S.C. Code Ann. § 8-13-700 (West 2022), which provides that "**[n]o** public official, public member, or **public employee may knowingly use his official office**, membership, or employment **to obtain an economic interest for himself, a family member**, an individual with whom he is associated, or a business with which he is associated." (*See* ECF No. 29-3 at 224.)

Plaintiff is a female and was employed by Defendant as the Athletic Director at Northwestern High School ("NWHS") from July 25, 2011, until her termination on September 13, 2019. (ECF No. 29-3 at 217.) As Athletic Director at NWHS, Plaintiff reported directly to the school's principal, supervised approximately fifty (50) to sixty (60) NWHS coaches, and had the following expressly stated responsibilities[1]:

- Administers all Rock Hill District #3 interscholastic athletic policies and procedures as well as the Rules and By-Laws of the SC High School League;
- Assists the principal in the evaluation and employment of all coaching positions;
- Develops all interscholastic athletic schedules;
- Works with head coaches to prepare the athletic budget;
- Prepares and submits the annual fiscal report and budget requests to the principal;
- Maintains current eligibility records, medical examinations, and academic eligibility requirements for all student athletes as required by the school district and state athletic association;
- Provides adequate supervision for all athletic contests;
- Employs and supervises support staff for all athletic events;
- Serves as athletic representative for the athletic booster club; [and]
- Assists the principal with supervision and implementation of athletic disciplinary

---

[1] Plaintiff described her job as involving:

> A lot of communication, a lot of e-mails. Really a lot of troubleshooting, a lot of ensuring that the coaches and athletes are taken care of day to day, be it making sure that eligibility is done, making sure that bus requests are in, making sure the facilities were in standing that they needed to be, that they were safe for practice and play. A lot of event management that includes making sure that the schedule is out, making sure the schedule is correct. . . . You know, it ranged anywhere from, again, stocking concessions to making sure that the coaches had all of the high school league and district requirements to coach.

(ECF No. 29-3 at 45:17–46:4.)

policies.

(ECF No. 29-3 at 32:22–33:1, 48:23–24, 208.)  At the inception of Plaintiff's employment, James Blake was the principal of NWHS.  Plaintiff and Principal Blake worked together for seven (7) years and had a "positive working relationship," which included having weekly meetings.  (*See generally id.* at 33:13–37:17.)  Plaintiff understood that the principal of NWHS "was the boss" and "if there was something that he didn't want to happen or disapproved of he had the final say."  (*Id.* at 36:2–4.)

At the time of Plaintiff's hire in July 2011, Defendant was already employing  Plaintiff's husband, James Allen West, and he was subsequently moved from the position of athletic trainer into a physical education teaching position to conform with the GBEA Policy.  (*Id.* at 29:21–30:23.)  While working under Principal Blake, Plaintiff recalls two (2) conversations about the GBEA Policy, once when she was hired and once "in September of 2015 or the fall of 2015 when the questions were raised, . . . ensuring that I was not supervising Jim [West], evaluating Jim [West] or purchasing equipment specifically for Jim [West]."  (*Id.* at 43:5–11.)  As part of this GBEA Policy discussion in 2015, Principal Blake wrote to Dr. Kelly Pew, the Superintendent of Rock Hill Schools, and offered the following explanation regarding the employment of Plaintiff and James West:

> In the summer of 2011, a committee selected Ms. Lauren West as our new Athletic Director.  Prior to offering her the position, questions were raised concerning her husband's employment at Northwestern and the direct contact he would have with his wife in reference to her supervision of him within the athletic department.  Prior to being given permission and offering the position to Ms. West, I assured personnel that the direct responsibility of supervision and evaluation would be out of my office.
>
> In the year prior to Ms. West joining our staff, Mr. West served as our school's Athletic Trainer. With Ms. West corning on board, Mr. West could not continue in this same capacity due to the fact that this would be a violation of the policy relating to nepotism.  Staff openings allowed for us to rearrange assignments and to move Mr. West out of the Athletic Training position.  He was assigned a fulltime Physical

Education instructor's position.  Mr.  West serves as one of three PE instructors that have the responsibility of training "all" of our students who elect to take our Total Body classes.

As for our athletic training, we were able to hire Ms. Laura Wilson to handle those responsibilities.

Decisions made for our athletic programs are made through my office.  Ms. West receives requests from our head coaches as to their program needs and we (Ms. West and I) seek the best avenue in providing for their needs.  We base our judgment solely on how it benefits the student/athlete and not on the wants of a coach.  We have utilized our boosters in gaining some of the "needed" materials when district funding was not available.

I hope that this helps to clarify the questions raised on the working relationship of Mr. and Ms. West.

(ECF No. 29-3 at 218.)  In response to what he was being told, Superintendent Pew procured the following legal opinion from counsel:

[I]n order to ensure that the employment of the two individuals does not violate Board policy or the Ethics Act, the school administration would need to ensure that the Athletic Director has no supervisory responsibility over her husband in his position.  I understand that the principal is considered the direct supervisor of the husband, since he is a physical education teacher and not a coach.  However, I further understand that the husband teaches strength and conditioning classes for several of the school's athletic programs.  Thus, while he is a physical education teacher, a majority of his work is likely performed through the school's weight room and program.  For these reasons, the administration should ensure that any supervision of the weight room or oversight of any funds associated with the weight room are handled exclusively by the principal.  **Further, the principal would need to authorize any payments of any kind to the husband whether for travel approval, travel reimbursement, or any other payments of any kind.**  The Athletic Director should also be made aware of the Board policy and the Ethics Act provisions to ensure that she is acting in compliance at all times.  Even with technical compliance with the policy and Ethics Act, there can still be perception issues, so we would encourage all measures be taken to ensure there is not even an appearance of non-compliance with the policy or Ethics Act.

In order to best ensure compliance, **we suggest that you ensure that the principal and the athletic director are made aware of these Board Policy issues and Ethics Act provisions which relate to the issue and request that they advise you in writing that they are aware of the issues and confirm in writing how their actions are in full compliance with these provisions.**

(ECF No. 29-3 at 220 (emphasis added).)  Principal Blake responded to Superintendent Pew as follows:

> I am writing you acknowledging receipt of the ruling by Childs & Halligan on the issue of James West's employment and role at Northwestern High School. Upon the hiring of Lauren West as our Athletic Director, a conversation was had with her about her role and the staff she was assigned to oversee. Ms. West was made aware of Board Policy GBEA (Staff Ethic/Conflict of Interest) and the concerns of her serving in a supervisor capacity over her husband.
>
> This letter serves as an official notification of my conversation with both Mr. and Ms. West about their supervisors and assigned roles. Ms. West has no supervisory role over her husband. Though Mr. West serves as a Physical Education teacher where students are assigned to his class that may elect to participate in athletics, his role in this capacity is supervised by our school's PE Department Chair. All personnel issues related to Mr. West's job performances will be handled out of my office. Likewise, all requested purchases related to the acquisition of services and/or equipment needed for the training of our students is directed through Northwestern's PE Department Chair and me.

(*Id.* at 222.) Subsequently, on February 1, 2016, Plaintiff sent correspondence to Superintendent Pew acknowledging the GBEA Policy:

> I am writing you at your request to address my employment on the same campus as my spouse James West.
>
> I am aware of the Rock Hill School District Board of Education Policy GBEA. During my tenure (since August 2011) at Northwestern High School I have and will continue to comply with this policy,
>
> I am grateful for the opportunity to serve Northwestern High School. I look forward to continued successes for the Trojans and the Rock Hill School District.

(ECF No. 29-3 at 226.) As a result of these discussions, Plaintiff believed that the GBEA Policy only required her "not to evaluate or supervise [James West] as a teacher or coach." (*Id.* at 40:8–25.)

In July of 2018, Hezekiah Massey replaced James Blake as principal of NWHS. (ECF No. 29-13 at 15:5–10.) As she had done with Principal Blake, Plaintiff tried to schedule weekly meetings with Principal Massey, but he would not show up for them. (ECF No. 29-3 at 53:23–54:10.) Moreover, Plaintiff and Principal Massey were unable to have a preliminary discussion on an "evaluative method or protocol." (ECF No. 29-13 at 42:17–22.)

On October 5, 2018, Northwestern High School played Clover High School in football.

*Football Game Recap: Clover vs. Northwestern*, https://www.maxpreps.com/news/PkhSnsTzI0W A_g9cnXakKw/football-game-recap-clover-vs-northwestern.htm (last visited Mar. 25, 2022). After the game, Plaintiff held a meeting with the football coaching staff to discuss allegedly unsportsmanlike and embarrassing on-field behavior by NWHS football players. (*See* ECF No. 29-3 at 63:7–66:21.) After Plaintiff had left the meeting, David Surratt, an assistant football coach, allegedly made comments about Plaintiff that led to an altercation with James West, who had also been in the meeting. (*Id.* at 80:18–81:7 ("Actually made a comment, and I was not there, something along the lines as 'Who the hell does she think she is coming down here running her mouth?' Or 'who does that bitch thing she is coming down here running her mouth?'").)

After her conversation with the football coaching staff, Plaintiff asserts that her relationship with head football coach James Martin changed wherein Coach Martin refused to communicate directly with Plaintiff, his supervisor, and instead communicated with Principal Massey, Plaintiff's supervisor. (*Id.* at 66:13–25.) Coach Martin eventually conveyed to Principal Massey that Plaintiff "did not want him to continue as coach," which caused Principal Massey to state that he and Plaintiff "both support you and we're going to make it through the season." (ECF No. 29-13 at 49:3–19.)

Towards the end of the fall semester, Plaintiff requested that Principal Massey give her a mid-year evaluation because she still did not know what his expectations were for her. (ECF No. 29-3 at 112:5–9.) Plaintiff asserts that Principal Massey agreed to conduct a mid-year evaluation but failed to actually conduct it. (*Id.* at 112:10–12. *Contra* ECF No. 29-13 at 32:10–14 ("There was not an instrument to use to provide a midyear evaluation for the athletic administrator.").) Principal Massey's actions made Plaintiff very concerned about the way Principal Massey treated her (and women in general):

As I mentioned, the circumventing, you know, allowing Coach Martin to circumvent chain of command with regards to me. I had expressed concern regarding some Title IX issues. He purchased the boys basketball team team shoes, did not purchase any for the girls. I had approached him about that and explained that that was a direct violation of Title IX.

I had concern about the lack of support from Mr. Massey, and I mentioned earlier that the situation with David Surratt and my recommendation after about 20 days of investigation that Surratt be held accountable. Mr. Massey did not support me on that.

There was a situation where I was made to go into a meeting with a parent that had exposed herself to me the year before. I had expressed concern to Mr. Massey about that and told him that I wasn't comfortable. His response was, "Well, it's another female exposing herself to a female." I was assured that he would be in the meeting. He had no intention of being in the meeting. As a matter of fact, he was off campus when that meeting was held at his daughter's signing in Clover.

(ECF No. 29-3 at 77:22–78:18.)

The first time I questioned [how Principal Massey treated females] was during volleyball season when people started noticing he was not attending volleyball games. And then the second is when like I said, when he bought the boys basketball team shoes and didn't do anything for the girls.

. . .

That was in December. There is an e-mail exchange between he and I, I believe, on the 13th just before I left for the NIAAA. So he calls the girls in. And understand this, Marshall: I expressed concern to him not only as the athletic director, but as a mother. I had a daughter on the girls team that I had to buy her basketball shoes. She didn't need another pair of basketball shoes, but because the coach wanted them to have a certain team shoe, we forked out $150 for another pair of basketball shoes that she didn't need. On the other side, the principal is paying for the boys. That's not right. That's blatant Title IX, so I respectfully bring that to his attention. So he calls the girls basketball team in for breakfast, has breakfast with them, says he's going buy them shooting shirts or something. He never follows through with it. Zero follow-through.

. . .

That particular situation had to have been that week of December 13. Again, the e-mail thread is somewhere around December 13th. Then we come into January. He travels all the way to Spartanburg, shows up to watch the boys play, but doesn't come watch the girls play. The next week I say something in an e-mail to him. He doesn't like it. He starts questioning how I am running the basketball game. Never had issues with that. Kim and I put a great deal of effort into that management, but that was his MO. Any time I said something he didn't like, he is coming back at me. We go to spring conference. I am the president of the state association. My principal doesn't show up to anything. I get awarded a national award. He is not

there.  Nobody knows anything about it because my principal is not there.

(ECF No. 29-3 at 127:21–129:10.)

Plaintiff decided to express her concerns to Dr. Tanya Campbell, the District's Chief

Personnel Officer, in the following e-mail sent on March 26, 2019:

> I am reaching out to you regarding the ongoing situation with the NHS football program and the _____[2] family.  I am no longer willing to refrain from expressing my concerns after the email from _____ that began circulating last night.  I have been completely eliminated from the chain of command with regards to the NHS football program since October 8th (2018) by Mr. Massey.  I have been dismissed from any District discussions regarding the _____ concerns since March 19th (2019).  No explanation as to why I have been eliminated and dismissed has been given to me.  My professional ethics and moral compass are being questioned and attacked, yet I am not being empowered to speak.
>
> Let me be specific regarding my concerns:
>
> Mr. Massey, Coach Martin and I met on March 6th, to discuss the initial email sent by the _____ outlining their concerns.  During that meeting I asked numerous times, "What set the _____ off?"  Mr. Massey and Coach Martin both responded they were unaware of anything.  From the beginning the tone of the conversation was one of bewilderment from both gentlemen.  However, it was brought to my attention last week, that _____ me[]t with Mr. Massey sometime around mid-February to express their concerns.  As I began to pull back layers of the _____ concerns, the emails sent on March 5th were due to the fact that the _____ felt their concerns were not being taken seriously by Mr. Massey and Coach Martin in previous meetings.  The emails completely blindsided me.  (Contrary to statements being made that James West and/or I prompted/incited the Johnson's to send the initial emails.)
>
> During the meeting on March 6th, I asked Mr. Massey why the football team was maxing the power clean?  On January 11th I was asked by Mr. Massey (following a phone conversation with you) to send an email to Coach Martin instructing him not to have the participants max this lift.  (I have attached that email for your review.  The email was never acknowledged by Mr. Massey or Coach Martin.)  He responded that he had a conversation with you after the email was sent and it was decided that the participants could max in the power clean due to the fact that our Middle Schools were maxing this lift.  Why would the change in direction not be shared with me at the time the decision was made?
>
> On March 6th, Mr. Massey scheduled a meeting with Athletic Trainer Laura Wilson for March 8th.  Ms. Wilson contacted me and asked if I would attend the meeting with her as she did not feel comfortable attending by herself.  I Indicated to her that out of professional courtesy she needed to alert Mr. Massey that she asked me to

---

[2] The blanks spaces in this e-mail represent redacted information.

attend the meeting. Ms. Wilson indicated that Mr. Massey (via Ms. Owens) told her, "Mrs. West will not be invited to the meeting." His response heightened Ms. Wilson's uneasiness about attending the meeting. As you are aware, I had her contact you for guidance. As Ms. Wilson's direct supervisor, why would I not be allowed to attend the meeting at her request? What message does this send to those that are in my direct line of supervision?

. . .

On March 14th, Mr. Massey asked that I forward an email to the NHS coaching staff regarding campus access ensuring "guests and visitors check in through the front office (Welcome Center) and receive visitor passes if they are on campus." It has been brought to my attention that certain guests/visitors are continuing to come onto campus without checking in through the front office to work with the football team and hang out with current staff; specifically Jamal Brown and Kevin Washington. I do not find either gentleman on the approved volunteer list for our school. If they have been hired as coaches, that information has not been shared with me. I do hope given the microscope the football program is currently under we are not allowing outside coaches to work with the students during first block that have not been approved by the District. Additionally, what are the rules? Do they only apply to a select few?

On March 21st I alerted Mr. Massey via text that I had an 8:00am meeting off-campus. This is the expectation he set for me in August. Since August, when I leave campus during the traditional workday-I have alerted him via text message. (To be transparent - there have been a few times I forgot to alert him. However, Kim Parrish ls always aware of my whereabouts.) When I am off campus for meetings out of town, I send emails to Mr. Massey and Kim Parrish. To my knowledge I have communicated as expected regarding my whereabouts. On the 21st, Mr. Massey responded to my text that I needed to sign in once I arrived on campus. Something I have not been required to do during the eight years I have worked at NHS. As I shared with him in the attached email, I have no issue communicating my whereabouts. I found the timing interesting given everything that is going on. I found it insulting that the new rules for me do not mirror the rules for everyone on campus - including Mr. Massey. For example: On March 13th, Mr. Massey and I were in Charleston for the SCHSL Spring Conference. He did not attend the awards breakfast or the legislative assembly that day. In fact, he left the hotel around 9:30 a.m. (I know because I passed him in the corridor going from the breakfast to the legislative assembly.) He did not report to campus on the 13th. (The conference concluded around noon on the 13th.) I arrived on campus around 4:30 p.m. and worked athletic events until 9:30 p.m. that evening. [I]s it petty of me to bring this to your attention? Yes. However, I find his actions overly egregious given the conscious approach I take towards my Job and amount of hours I work. (Email exchange is attached.)

The concerns listed above are a small snapshot of my concerns. I have shared my concerns with Mr. Massey on numerous occasions; most recently on March 8th. Mr. Massey tells me what I want to hear when we meet but his actions and follow-up have yet to catch up to his words. . . . I feel as though I have served the

Northwestern High School and Rock Hill School District well the past eight years. The disrespect I have been shown is simply not warranted. To be sidelined, to send out the impression that I am not capable of performing my job and cannot be trusted are actions I feel I deserve answers to.

In closing, I ask for the District to acknowledge that Mr. Massey knowingly and purposefully removed me from the chain of command with regards to Coach Martin and NHS football program; protecting me from being held liable in any lawsuit that might stem from the 2018-2019 NHS football program/school year. I am requesting that a meeting be held with Mr. Massey, you and me to review my job description and expectations; as my previous attempts to gain a clear understanding from Mr. Massey one-on-one have been futile.

(ECF No. 29-3 at 256–258.) On March 29, 2019, Plaintiff met with Principal Massey, and they discussed his expectations. (*Id.* at 112:18–113:17.)

On or about April 22, 2019, Coach Martin sent the following letter to Principal Massey and District Superintendent Dr. Bill Cook:

Please accept this letter as a formal notification that I will be resigning as the head coach of the Northwestern High School Football Team. My resignation is effective now with respect and love for the program to allow the players to get back to business and focus on the importance of the team.

I remain very concerned about the deterioration of the program and the low morale of the coaches and the players especially now after losing two head coaches in the span of a year and a half. **My prayers will be with the coaching staff who have to continue to endure the hostile work environment that has been created by the Athletic Director. I also pray that the coaches and players can withstand the internal erosion that the Athletic Director has brought to this program.** In my 22 years of coaching, my career and my intentions have never been questioned. It is appalling to me that there are people in this world who would stoop to false accusations and bullying to remove coaches for no other reason except that they just don't like them anymore or they simply didn't win enough games to be successful in their eyes. It is unfortunate that Northwestern has become splintered and unhealthy due to these false accusations and missions to destroy my career and reputation. I pray with this resignation, I can help to save what dignity is left in the program and in my career.

We must all remember when kids are in sports, they grow and mature with a lifetime of memories and great lessons. We as teachers and coaches are responsible to help them learn these life lessons. We are their mentors and certainly their advocates for a good education and to have good sportsmanship. I have always tried to be that coach for my players, holding myself to the highest standard of character, and doing my best to instill that in the players I have coached. More than coaching the x's and o's of football, it was my hope that I could help build the program by mentoring

11

these young boys into men of character. Football should not just be a game where success is only measured in wins and losses, but about how you play the game with good character and learn about life through the wins and losses. My hope now is that they will see this lesson of humility, honesty, integrity and good character on full display as I put myself aside for the greater good of them and the team.

Most importantly, I need to also think and be concerned for myself. my health and my family. As a football coach, there were times when I had to sacrifice time with my family, missing a game or event of my own kids because of practices or games of my team. My decision to resign is a decision I am making so that I can spend more time with my family, watch my children grow, play their own sports and never have to miss another game. I have also decided to take time to further my education, while I take steps to remove the years of stress from my life so that I can better my health. I plan to continue coaching in the future, but for now my family needs me more and my time will be better well spent with them.

I am evermore grateful that you led an investigation with dignity and stood by my side with your findings. I look forward to continue to serve the Rock Hill School District in my classroom as a teacher. I wish you all the best and pray you find peace as I have in the end.

(ECF No. 29-3 at 262.) After Coach Martin's resignation, Plaintiff spent late April through June of 2019 on a search committee for a new head football coach with Principal Massey. (*See generally id.* at 93:18–106:17.) On May 10, 2019, Plaintiff signed a Contract for Employment for a term starting on July 1, 2019, through June 30, 2020. (ECF No. 29-3 at 250.) The Contract expressly stated that Plaintiff "shall receive a performance evaluation in accordance with District policy and procedure." (*Id.*)

On May 21, 2019, Dr. Luanne Kokolis, Defendant's Chief of Strategic Planning, Engagement, and Program Support, sent Principal Massey a document purporting to be the new evaluation for the District's Athletic Directors. (ECF No. 29-13 at 65:23–66:7.) Dr. Kokolis stated that she would meet with each high school principal regarding the evaluation and then she and the principal would meet with their respective Athletic Directors. (*Id.* at 183.) On July 23, 2019, Principal Massey gave Plaintiff her Athletic Director Evaluation for the 2018–19 school year.[3]

---

[3] Plaintiff had not received a performance evaluation for the 2017–18 school year from Blake. (ECF No. 29-3 at 107:19–21.) Moreover, prior to May 21, 2019, in order to gauge performance,

(ECF No. 29-3 at 107:2–18.)  Principal Massey concluded that Plaintiff had performed deficiently in the categories of effective management, climate, school/community relations, ethical behavior, and interpersonal skills.  (*Id.* at 282–86.)  Principal Massey ultimately made the following recommendation regarding Plaintiff:

> Recommendations: In summary Ms. West will need to continue to work closely with the principal to bring the athletic department of Northwestern High School to a respectable level within our community by working with stakeholders to re-establish trust and support.  Ms. West will need to develop plans for removing negative balances in accounts and seek assistance if needed to build other accounts to offset balances in the red.  Ms. West will also participate in all staff activities unless excused by the principal and will continue to report her whereabouts and expected time of return when planning to leave campus to ensure she is following protocol.  As stated, Ms. West will work to timely respond to requests from coaches and other staff to provide support for all programs on a consistent basis.  She will also refrain from addressing and confronting coaches with criticism and critique of student-athlete performance within a 24hr period unless there is a safety concern that exists which necessitates investigation.  These and other recommendations included within the individual areas will ensure improvement in the overall performance rating of Ms. West as Northwestern High School's athletic director.

(ECF No. 29-3 at 286.)

In her opinion, Plaintiff's Athletic Director Evaluation contained intentional inaccuracies and ignored prior communications between Plaintiff and Principal Massey about cited issues for him to justify a "needs improvement" finding.  (*Id.* at 109:5–124:25.)  Moreover, Plaintiff was surprised when Dr. Campbell and Dr. Kokolis appeared at the July 23, 2019 meeting, something Plaintiff asserts that they did not do for the two (2) other male Athletic Directors in the District.  (*Id.* at 130:4–131:8.)  After the Athletic Director Evaluation discussion concluded, Dr. Campbell and Dr. Kokolis brought up a spring audit that the District had conducted of the three (3) high schools and five (5) middle schools.  (*Id.* at 131:9–16.)  Dr. Campbell and Dr. Kokolis questioned Plaintiff about her husband, James West, and daughter, Daven West, working as paid staffers at

---

athletic directors in the District generally engaged in self-evaluation in combination with a performance discussion with his/her school principal.  (ECF No. 29-14 at 27:11–28:1.)

sporting events, their pay, and how cash money was used. (*Id.* at 131:16–25, 134:8–23.)

On July 30, 2019, Plaintiff sent the following letter to Principal Massey:

I write this memorandum as a result of the evaluation given to me on July 23 and the meeting I participated in with you, Dr. Tanya Campbell and Dr. Luanne Kokolis where there were serious accusations and charges made involving my oversight of certain athletic activities and finances related thereto. At that meeting I fully explained that I did not believe there was any validity to the charges and that I was being singled out for the criticism and allegations relating to the same.

I believe that I'm being held to a different standard tha[n] others similarly situated and have been disparately treated because of my gender and my marital status to James West a former coach at Northwestern High School.

I made it clear when I was hired, that in order to avoid the appearance of impropriety I would not supervise my husband when he was strength coach. I did not do so and tried to scrupulously avoid taking any actions which would create that impression. Clearly, however, he remained an employee of the district and worked under former football coach James Martin. I stayed out of their issues but as the Athletic Director, I continued to supervise Coach Martin's activities and performance. You and I had many interactions involving issues within the athletic department and former Coach Martin and [I] did not agree on a lot of them. I always carried out your instructions but apparently made you very unhappy with me in the process.

You have deliberately taken away responsibilities of mine as Athletic Director and have usurped them out of some personal issues with me. This was not fair nor appropriate, but I have gone along with all of them.

I have found it necessary to speak with an employment attorney who tells me that my rights have likely been violated and that I may have been discriminated against on several basis including, gender, and possible race discrimination. Nevertheless, I do not wish to take adversarial action against the district or any individuals because I love this school and I have done my best to perform my duties here in an acceptable and positive way. Incidentally I have received citations and awards for my leadership and believe that I am as successful or more successful than any other high school Athletic Director in South Carolina. I am a loyal team player, but I do desire a level playing field.

While we have not received the final audit, I do not believe that the school lost any money in the handling of admission to athletic events regardless of who worked the gates during that time. Certainly, someone had to do this work and I do not believe any fault can be subscribed to any of the persons who did that work including my husband James.

While the evaluation and charges made were grossly unfair and discriminatory, I

would hope that we can go forward in a positive and mutually respectful environment in the upcoming school year.

(ECF No. 29-3 at 295.)

On July 31, 2019, Plaintiff met again with Dr. Campbell and Dr. Kokolis at the District Office. (*Id.* at 143:11–12.) Dr. Campbell and Dr. Kokolis gave Plaintiff the chance to resign, which she refused, told Plaintiff the only recourse was termination, and placed Plaintiff on administrative leave. (*Id.* at 143:19–144:12.) Dr. Campbell also gave Plaintiff the following letter:

> The purpose of this letter is to notify you that you are being placed on administrative leave, with full pay and benefits, effective immediately. The administrative leave will continue until such time as you have been notified by me. You will be expected to be available by telephone during regular business hours and will need to provide us with a number where you can be reached. This action is being taken as a result [of] our meeting held on July 31st, 2019 where we discussed concerns related to violation of policies GBEA and DM.

> In the meantime, you are not to return to Northwestern High School or any other schools in the District without my prior permission. Additionally, you are not to have any contact with employees, students, or parents associated with Rock Hill Schools, whether initiated by you or by them, until such time as this matter is resolved (including in person, electronic communication, telephone calls, or other communications).

(ECF No. 29-3 at 297.) On August 5, 2019, Dr. Campbell sent Plaintiff the following letter:

> I am writing to follow up our conferences with you on July 23 and 31, 2019, and confirm in writing the basis for the administration's recommendation that your employment with the District be terminated.

> As you are aware, on July 23, 2019, Dr. Luanne Kokolis, Chief of Strategic Planning, Engagement and Program Support, Hezekiah Massey, principal at Northwestern High School (NWHS), and I met with you to discuss concerns. Mr. Massey reviewed with you your performance evaluation for the 2018-19 school year. As you are aware, the results of your 2018–19 performance evaluation, a copy of which is enclosed, included five Needs Improvement ratings in the areas of Effective Management; Climate; School/Community Relations; Ethical Behavior; and Interpersonal Skills. Your overall rating for the 2018-19 school year was Needs Improvement. The evaluation also identified several recommendations for your performance.[4]

---

[4] Plaintiff asserts that the reference to the results of her Athletic Director Evaluation contradicts the statement to her by Dr. Campbell and Dr. Kokolis on July 23, 2019, that the audit results establishing a violation of the GBEA Policy were enough to warrant Plaintiff's termination. (ECF

Dr. Kokolis and I then reviewed with you concerns that have surfaced in a recent audit conducted of the Athletic Department at NWHS. A copy of the Audit Summary provided to you during the conference is enclosed. While some of the concerns identified in the audit could be addressed and corrected, some serious concerns arose with respect to your authorizing or approving school and/or District funds to be paid to your husband and to your daughter. Among other things, the audit results stated that your husband and daughter (a student at NWHS) were paid through ArbiterPay when assigned to work at sporting events. Both your husband and daughter were working as paid event staffers while you were serving as the Administrator-on-Duty. You assigned payment amounts for your family members that varied by sport and by position. The Audit reflects that from August 2018 to November 2018, your daughter worked as a paid staffer at several sporting events and received a total of $775 through ArbiterPay, which was paid while you were the Administrator on Duty. According to records, your husband received payments through ArbiterPay from January 2017 to May 2019, $2,160 of which was paid while you were the Administrator on Duty. In addition, a separate concern was raised in the audit about cash payments being paid to other staff members for services rendered from monies collected from concessions during athletic events, which is a violation of procedure.

During our July 23 conference, we provided you with a full opportunity to respond to the concerns. When asked about these payments to your family members, you acknowledged them and did not dispute them during our conference or in your written response to the allegations. The issue is not that event/manager positions were put into place, but rather the concern is with your actions with respect to authorizing payments to your family members in violation of District Policy and State law. You also acknowledged making the cash payments to other staff members collected from concessions.

Your actions are of particular concern given the significant efforts the District administration made to ensure that you conducted yourself at all times consistent with State law and Board Policy GBEA (Staff Code of Ethics). In addition to all the guidance given to you, by letter dated February 1, 2016, a copy of which is enclosed, you advised the District's then Superintendent, Dr. Kelly Pew, "I am aware of the Rock Hill School District Board of Education Policy GBEA. During my tenure (since August 2011) at Northwestern High School I have and will continue to comply with this policy." Policy GBEA, a copy of which is enclosed, provides, among other things, that Section 8-13-750 of the South Carolina Ethics Act provides that no public employee may cause the employment, appointment, promotion, transfer, or advancement of a family member to a position in which the public employee supervises or manages. Further, Section 8-13-700 provides that a public employee may not use his/her employment to obtain an economic interest for him/herself or a family member.

No. 29-3 at 146:7–22 ("It does, however, it contradicts the meeting we had, we being Campbell, Kokolis and I, on the 23rd where she tells me the policy violations are standalone, and based on the policy and state statute violations alone, she's recommending my termination.").)

Dr. Kokolis and I met with you again on July 31 to review our concerns and advise you that we were left with no alternative but to recommend that your employment with the District be terminated. We offered you the opportunity to resign prior to formalizing the termination recommendation in writing, but you declined to do so. For all of these reasons, including the concerns identified in your performance evaluation, as well as the concerns identified in the audit that are violations of District Policy GBEA, the administration is recommending to the District's Superintendent, Dr. William Cook, that your employment with the District be terminated. We will be in touch with you to schedule a pre-termination hearing before Dr. Cook prior to his taking any action.

(ECF No. 29-3 at 298–99.)

On August 9, 2019, Plaintiff, her husband, and her attorney met with Superintendent Cook, attorney Kathy Mahoney, Dr. Campbell, and Principal Massey at the District's office. (*Id.* at 147:1–15.) Plaintiff conveyed that she disputed the results of her performance evaluation, but did not dispute the results of the audit, instead voicing displeasure with Defendant's application of the GBEA Policy against her. (*Id.* at 147:16–149:24.) On August 21, 2019, Superintendent Cook sent Plaintiff the following letter:

I am writing to follow up your pre-termination meeting before me on Friday, August 9, 2019. Present were you; your husband; your attorney; Dr. Tanya Campbell, Chief Personnel Officer; Hezekiah Massey, Northwestern High School ("NHS") principal; and the District's attorney.

During our conference, Dr. Campbell reviewed with you the basis for her recommendation that your employment with the District be terminated. You were then provided with a full opportunity to respond to the allegations and present any information you considered relevant.

In her presentation, Dr. Campbell summarized the concerns outlined in her letter to you dated August 5, 2019, which sets forth the basis for her recommendation. Dr. Campbell's recommendation was based both on the concerns raised in your performance evaluation for the 2018–19 school year, as well as on the concerns that surfaced in a recent audit conducted of the Athletic Department at NHS, which established that you violated District policies and State law.

Following Dr. Campbell's summary, you disputed several issues that were addressed in your performance evaluation. However, in response to the Audit Summary, you acknowledged that you had authorized or approved school and/or District funds to be paid to your husband and to your daughter. Among other things, the audit results stated that your husband and daughter (a student at NHS) were paid through ArbiterPay when assigned to work at sporting events. Both your husband

and daughter were working as paid event staffers while you were serving as the Administrator on Duty. You assigned payment amounts for your family members that varied by sport and by position. The Audit reflects that from August 2018 to November 2018, your daughter worked as a paid staffer at several sporting events and received a total of $775 through ArbiterPay, which was paid while you were the Administrator on Duty. According to records, your husband received payments through ArbiterPay from January 2017 to May 2019, $2,160 of which was paid while you were the Administrator on Duty. You acknowledged these payments to your family members to be true in your original meeting with Dr. Campbell, in your written response to the allegations, and during your meeting with me. These payments to your family members are in violation of District Policy and State law.

A separate concern was raised in the audit about cash payments being paid to other staff members for services rendered from monies collected from concessions during athletic events, which is a violation of District procedure and Board Policy DM (Cash in School Buildings). You acknowledged making the cash payments to other staff members collected from concessions.

As Dr. Campbell advised you in her letter, and during the conference, your actions are of particular concern given the significant efforts the District administration made to ensure that you conducted yourself at all times consistent with State law and Board Policy GBEA (Staff Code of Ethics). In addition to all the guidance given to you, by letter dated February 1, 2016, you advised the District's then Superintendent, Dr. Kelly Pew, "I am aware of the Rock Hill School District Board of Education Policy GBEA. During my tenure (since August 2011) at Northwestern High School I have and will continue to comply with this policy." You acknowledged during our meeting that you had written the February 2016 letter. However, you stated that you did not read Policy GBEA or understand that it prohibited the payments to your family members. Your response is not consistent with what you stated in your February 1, 2016 letter.

For all of these reasons, I am upholding the administration's recommendation that your employment with the District be terminated, effective September l, 2019. You will remain on administrative leave, with pay, through September 1, 2019. As such, the terms of your administrative leave will remain in effect through September 1, 2019, and you should not perform any of your job responsibilities with Northwestern High School or the District. While you will no longer be a District employee, you will retain your rights as a parent of your child to be on District or school property and will be expected to comply with all applicable policies and procedures for parents.

If you wish to appeal my decision to the Board, you may do so by submitting an appeal to my attention within five days of your receipt of my decision, pursuant to Board Policy GBK/GBK-R (Staff Concerns/Complaints/Grievances).

(ECF No. 29-3 at 300–01.)

    Plaintiff appealed her termination to the District's school board. (*Id.* at 150:17–151:1.)

Helena Miller, the Board Chair of the Rock Hill School District Board of Trustees, upheld Plaintiff's termination as conveyed in the following September 11, 2019 letter:

> This is to advise you that at its meeting on September 9, 2019, the Rock Hill School District Board of Trustees considered your request for a hearing before the Board on your grievance regarding the administration's termination of your employment with the District. After reviewing and considering the correspondence and responses from the administrative level, the Board voted to uphold the decision of the administration and deny your request for a grievance hearing.

(*Id.* at 302.) On September 12, 2019, Superintendent Cook sent Plaintiff the following letter confirming her termination, effective September 13, 2019:

> In follow up to the Board Chair's letter to you dated September 11, 2019, this is to confirm that your termination from your employment with the District will be effective September 13, 2019. Information regarding your right to continue your health insurance coverage, through COBRA, at your expense, will be forwarded to you separately.

(*Id.* at 303.)

Plaintiff filed a charge of discrimination against Defendant with the United States Equal Employment Opportunity Commission and the South Carolina Human Affairs Commission on September 4, 2019. (ECF No. 29-3 at 304.) Plaintiff alleged discrimination based on her sex and retaliation. (*Id.*) After receiving a right to sue letter dated April 8, 2020 (*id.* at 308), Plaintiff filed an action in the York County (South Carolina) Court of Common Pleas on April 22, 2020. (ECF No. 1-1.) She alleged claims under Title VII for discrimination and retaliation. (*Id.* at 7 ¶ 33–9 ¶ 45.)

On May 21, 2020, Defendant removed the case to this court based on federal subject matter jurisdiction and answered the Complaint, generally denying the substantive allegations. (ECF Nos. 1 at 1 ¶ 2, 4.) After the parties engaged in discovery, Defendant filed a Motion for Summary Judgment on May 7, 2021. (ECF No. 29.) Thereafter, the parties responded and replied to this Motion. (*See* ECF Nos. 35, 39.) In accordance with 28 U.S.C. § 636(b)(1) and Local Civil Rule

73.02 D.S.C., the Magistrate Judge issued her Report and Recommendation on December 17, 2021, recommending that Defendant's Motion for Summary Judgment be granted as to both of Plaintiff's claims.  (ECF No. 48 at 42.)  On January 18, 2022, Plaintiff filed Objections to the Report and Recommendation.  (ECF No. 52.)

The court considers the merits of Plaintiff's Objections to the Report and Recommendation below.

## II.    JURISDICTION

This court has jurisdiction over Plaintiff's claims alleging violations of Title VII via 28 U.S.C. § 1331, as the claims arise under the laws of the United States.  Moreover, district courts are expressly empowered to hear claims brought under Title VII.  *See* 42 U.S.C. §§ 2000e–5(f)(3), 12117, 29 U.S.C. § 633(c).

## III.    LEGAL STANDARD

A.    The Magistrate Judge's Report and Recommendation

The Magistrate Judge makes only a recommendation to this court.  The recommendation has no presumptive weight.  The responsibility to make a final determination remains with this court.  *See Mathews v. Weber*, 423 U.S. 261, 270–71 (1976).  The court reviews de novo only those portions of a magistrate judge's report and recommendation to which specific objections are filed and reviews those portions which are not objected to - including those portions to which only "general and conclusory" objections have been made - for clear error.  *Diamond v. Colonial Life & Acc. Ins. Co.*, 416 F.3d 310, 315 (4th Cir. 2005); *Camby v. Davis*, 718 F.2d 198, 200 (4th Cir. 1983); *Orpiano v. Johnson*, 687 F.2d 44, 47 (4th Cir. 1982).  The court may accept, reject, or modify, in whole or in part, the recommendation of the magistrate judge or recommit the matter with instructions.  *See* 28 U.S.C. § 636(b)(1).

B.    <u>Summary Judgment Generally</u>

Summary judgment should be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  A fact is "material" if proof of its existence or non-existence would affect the disposition of the case under the applicable law.  *Anderson v. Liberty Lobby Inc.*, 477 U.S. 242, 248–49 (1986).  A genuine question of material fact exists where, after reviewing the record as a whole, the court finds that a reasonable jury could return a verdict for the nonmoving party. *Newport News Holdings Corp. v. Virtual City Vision*, 650 F.3d 423, 434 (4th Cir. 2011).  In ruling on a motion for summary judgment, a court must view the evidence in the light most favorable to the non-moving party. *Perini Corp. v. Perini Constr., Inc.*, 915 F.2d 121, 123-24 (4th Cir. 1990).  The non-moving party may not oppose a motion for summary judgment with mere allegations or denial of the movant's pleading, but instead must "set forth specific facts" demonstrating a genuine issue for trial.  Fed. R. Civ. P. 56(e); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986); *Shealy v. Winston*, 929 F.2d 1009, 1012 (4th Cir. 1991).  All that is required is that "sufficient evidence supporting the claimed factual dispute be shown to require a jury or judge to resolve the parties' differing versions of the truth at trial."  *Anderson*, 477 U.S. at 249.

C.    <u>Sex Discrimination under Title VII</u>

Plaintiff alleges that she was discriminated against when Defendant terminated her because of her sex in violation of Title VII.  Title VII makes it unlawful for an employer "to discharge any individual or otherwise discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin; . . . ."  42 U.S.C. § 2000e-2(a)(1).  "The law is clear on how a Title VII

plaintiff may survive a motion for summary judgment." *Moss v. Savannah River Remediation, LLC*, Civil Action No.: 1:14-cv-03808-JMC, 2016 WL 5402859, at *3 (D.S.C. Sept. 28, 2016). "Plaintiffs may prove [Title VII] violations either through direct and indirect evidence of retaliatory animus, or through the burden-shifting framework of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973)." *Foster v. Univ. of Md-E. Shore*, 787 F.3d 243, 249 (4th Cir. 2015) (citation omitted). The United States Court of Appeals for the Fourth Circuit refers "to these two 'avenues of proof' as the 'mixed-motive' framework and the 'pretext' framework, respectively." *Id.* (citing *Hill v. Lockheed Martin Logistics Mgmt., Inc.*, 354 F.3d 277, 284–85 (4th Cir. 2004)). "It is left to the plaintiff's discretion whether to proceed by direct and indirect evidence or by mean[s] of the *McDonnell Douglas* burden-shifting framework." *Id.* (citing *Diamond v. Colonial Life & Accident Ins. Co.*, 416 F.3d 310, 318 n.4 (4th Cir. 2005) ("In the event that a plaintiff has direct evidence of discrimination or simply prefers to proceed without the benefit of the burden-shifting framework, she is under no obligation to make out a prima facie case.")).

Pursuant to the *McDonnell Douglas Corp.* burden-shifting framework, the plaintiff "first must make out a prima facie case of discrimination." *Merritt v. Old Dominion Freight*, 601 F.3d 289, 294 (4th Cir. 2010). Without direct evidence of discriminatory motive, "[a] plaintiff may show a prima face case of sex discrimination by showing: (1) membership in a protected class; (2) satisfactory work performance; (3) adverse employment action; and (4) similarly situated employees outside the protected class were treated more favorably." *Maxie v. Brown & Brown, Inc.*, Civil Action No. 2:20-0806-RMG, 2022 WL 780732, at *2 (D.S.C. Mar. 15, 2022) (citing *Gerner v. Cty. of Chesterfield*, 674 F.3d 264, 266 (4th Cir. 2012)). "The employer may then rebut the prima facie case by showing that there was a legitimate non-discriminatory reason for the adverse action, after which the burden shifts back to the plaintiff to show that those reasons are

pretextual." *Hammett v. S.C. Dep't of Health & Envtl. Control*, C/A No. 3:10-932-MBS-SVH, 2013 WL 1316440, at *5 (D.S.C. Jan. 25, 2013) (citing *Diamond v. Colonial Life & Acc. Ins. Co.*, 416 F.3d 310, 318 (4th Cir. 2005)). *See also Wilson v. Genesis Healthcare, Inc.*, C/A No. 4:17-cv-3318-RBH-TER, 2019 WL 3208842, at *5 (D.S.C. July 1, 2019) ("Once Defendant has met its burden of production by producing its legitimate, nondiscriminatory reason, the sole remaining issue is 'discrimination vel non.' In other words, the burden shifts back to Plaintiff to demonstrate by a preponderance of the evidence that the legitimate reason produced by Defendant is not its true reason, but was pretext for discrimination or retaliation." (citing *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 143 (2000))). If the plaintiff does not proffer sufficient evidence to create a genuine issue of material fact regarding whether the employer's articulated reason is pretextual, the employer is entitled to summary judgment on the plaintiff's claim.

"To survive summary judgment under the mixed-motive method of proof, an employee must present sufficient direct or circumstantial evidence for a reasonable jury to find that a protected trait 'actually motivated' his employer's decision to take an adverse employment action." *Croft v. City of Roanoke*, 862 F. Supp. 2d 487, 494 (W.D. Va. 2012) (citing *Reeves*, 530 U.S. at 141). "While the employee need not demonstrate that the protected trait was the sole motivating factor, he must show that it 'actually played a role in the employer's decisionmaking process and had a determinative influence on the outcome.'" *Id.* "Thus, under the mixed-motive analysis, the question distills to whether [plaintiff] has marshaled sufficient evidence for a reasonable jury to find that the [defendant's] disciplinary action against h[er] was 'at least in part motivated by [gender] bias.'" *Id.* (citing *Murray v. United Food & Commercial Workers Union*, 100 F. App'x 165, 176 (4th Cir. 2004)).

D.    Retaliation under Title VII

Plaintiff asserts that she was retaliated against for engaging in activity protected under Title VII. (*E.g.*, ECF No. 35 at 14.)  Title VII protects individuals from retaliation.  *See* 42 U.S.C. § 2000e-3(a).  More specifically, "Title VII proscribes discrimination against an employee because, in relevant part, she 'has opposed any practice made an unlawful employment practice by this subchapter, . . . .'"  *Boyer-Liberto v. Fontainebleau Corp.*, 786 F.3d 264, 281 (4th Cir. 2015) (quoting 42 U.S.C. § 2000e-3(a)).

To prevail under the *McDonnell Douglas Corp.* burden-shifting framework,[5] a plaintiff must establish a prima facie case of retaliation under Title VII by showing (1) that she engaged in protected activity[6]; (2) that her employer took an adverse employment action against him; and (3) that a causal connection existed between the protected activity and the asserted adverse action. *Munday v. Waste Mgmt. of N. Am., Inc.*, 126 F.3d 239, 242 (4th Cir. 1997).  If the plaintiff establishes a prima facie case of retaliation, the defendant can rebut the presumption of retaliation by articulating a non-discriminatory reason for its action.  *Matvia v. Bald Head Island Mgmt., Inc.*, 259 F.3d 261, 271 (4th Cir. 2001) (citation omitted).  At that point, the plaintiff has the opportunity to prove that the employer's legitimate, non-discriminatory reason is pretextual.  *Id.*

---

[5] "[T]here is no mixed motive theory of causation in the retaliation context; the plaintiff must prove that the protected activity was the but for cause of the retaliation."  *Baka v. City of Norfolk*, Civil No. 2:19cv458, 2021 WL 3928836, at *10 (E.D. Va. July 28, 2021) (citing *Univ. of Tex. S.W. Med. Ctr. v. Nassar*, 570 U.S. 338, 352 (2013)).  *See also Smyth-Riding v. Sci. & Eng'g Servs., LLC*, 699 F. App'x 146, 152 n.7 (4th Cir. 2017) ("*Nassar* rejected the mixed-motive analysis for Title VII retaliation claims, and reiterated that the statutory text for Title VII retaliation claims relies on a but-for causation standard." (citation omitted)).

[6] "In the context of element one of a retaliation claim, an employee is protected when she opposes 'not only . . . employment actions actually unlawful under Title VII but also employment actions [she] reasonably believes to be unlawful.'"  *Boyer-Liberto*, 786 F.3d at 282 (quoting *EEOC v. Navy Fed. Credit Union*, 424 F.3d 397, 406 (4th Cir. 2005)).

## IV.     ANALYSIS

A.     <u>The Report and Recommendation</u>

Upon her review, the Magistrate Judge concluded that Plaintiff established a prima facie case of sex discrimination under Title VII, and Defendant had two (2) legitimate, nondiscriminatory reasons for its actions (the results of the internal audit and Plaintiff's failure to meet certain legitimate expectations).  (ECF No. 48 at 16–22.)  However, at the pretext stage of her sex discrimination analysis, the Magistrate Judge concluded "that Plaintiff has not provided sufficient evidence to present a triable issue of fact as to whether Defendant's proffered reason for terminating her when it did was pretextual."  (*Id.* at 30.)  The Magistrate Judge further opined that even if a mixed-motive analysis was conducted, as argued by Plaintiff, the evidence was insufficient "for a reasonable jury to conclude, by a preponderance of the evidence, that Mr. Massey or the District were motivated to remove Plaintiff based on gender."  (*Id.* at 34.)

Next, the Magistrate Judge observed that although Plaintiff can demonstrate a prima facie case of retaliation, her claim ultimately fails because the evidence does not demonstrate "that her termination was the product of an email she sent, or, stated differently, that a reasonable jury could not find that Plaintiff probably was fired for retaliatory purposes."  (*Id.* at 42.)

As a result of the foregoing, the Magistrate Judge recommended that the court grant Defendant's Motion for Summary Judgment.  (*Id.*)

B.     <u>Plaintiff's Objections</u>

Because the Magistrate Judge's ultimate conclusion was that Plaintiff's evidence did not establish that the legitimate reasons produced by Defendant for Plaintiff's termination was pretext for discrimination or retaliation, Plaintiff's objections focus on the issue of pretext.  Plaintiff first asserts that the Magistrate Judge erroneously discounted her evidence of pretext instead choosing

to find credible the "bombastic and false assertions" in Massey's 2018–2019 evaluation of Plaintiff.  (ECF No. 52 at 4.)  As examples, Plaintiff points out that the Magistrate Judge simply ignored: (1) Massey had supervised Plaintiff for only one (1) year and his description of climate created by Plaintiff was contradicted by other co-workers who had worked with her; (2) Plaintiff had not been trained as promised by Defendant on the evaluation tool used by Massey; (3) Massey's expectations were not legitimate when Plaintiff had been meeting Defendant's expectations; (4) for eight (8) years, Plaintiff and her husband worked at the same high school without the GBEA Policy being an issue; and (5) Superintendent Cook's decision to terminate Plaintiff was based on Massey's assessment even though he had never conveyed to Superintendent Cook any complaints about Plaintiff's performance prior to the termination recommendation.  (*Id.* at 4–12, 21–22.)

Plaintiff next argues that the Magistrate Judge "ignore[d] significant comparator evidence [relevant to her last year employment] when analyzing pretext" showing that [William "Bill"] Warren, a male, had committed the same violation of Board Policy GBEA, but was not terminated. (*Id.* at 12–16.)  Moreover, Plaintiff asserts that the Magistrate Judge completely ignored Plaintiff's evidence depicting the express differences in how Defendant treated Plaintiff and how it treated male Athletic Directors regarding campus location reports, violations of duty or policy, faculty meeting attendance, and resources available to address parent-student issues.  (*Id.* at 17–18.)

Plaintiff complains that the Magistrate Judge erred by requiring Plaintiff to provide direct evidence of discrimination in the context of the mixed-motive framework.   (*Id.* at 19–20 (citing *Desert Palace, Inc. v. Costa*, 539 U.S. 90, 99-102 (2003)).)  To this point, Plaintiff states that the following "combination of circumstantial evidence is more than sufficient to meet the motivating factor standard of proof requirement under the mixed-motive theory"  (*id.* at 21):

that men in the same position were treated more favorably than Plaintiff, evaluated differently than Plaintiff, allowed to break rules Plaintiff was not allowed to break, subjected to less scrutiny and fewer requirements than Plaintiff; that the allegations lodged against Plaintiff in her evaluation are shown to be false by the independent third party testimony and evidence; that Defendant changed its own interpretation and enforcement of policies in order to develop excuses for Plaintiff's termination; and that Plaintiff was replaced by a man who was thereafter treated better than Plaintiff by the same set of supervisors.

(*Id.* at 20–21.)

With specific reference to her retaliation claim, Plaintiff objects to the Magistrate Judge's determination that Plaintiff's July 30, 2019 email was her only protected activity. (ECF No. 52 at 23.) Plaintiff argues that conveying her opposition to Massey when a male football coach referred to her as a "bitch" should also be considered protected activity. (*Id.* at 23–24.) Plaintiff further argues that conveying her concerns to Dr. Campbell on March 26, 2019, that Massey was intentionally excluding Plaintiff from the chain of command was also protected activity. (*Id.* at 25.)

C.    The Court's Review

    *1. Pretext*

The court observes that "[t]he final pretext inquiry 'merges with the ultimate burden of persuading the court that [the plaintiff] has been the victim of intentional discrimination,' which at all times remains with the plaintiff." *Merritt*, 601 F.3d at 294 (quoting *Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 256 (1981)). "Thus, the question is whether Plaintiff has presented or forecasted evidence that Defendant's reason was not the true reason, but was a mere pretext for discrimination, sufficient to survive summary judgment." *Lee v. Market Am.*, Case No. 1:18CV1046, 2022 WL 475326, at *7 (M.D.N.C. Feb. 16, 2022) (citing *Reeves*, 530 U.S. at 143). "An employer is entitled to summary judgment on the issue of pretext if the employee 'create[s] only a weak issue of fact as to whether the employer's reason [is] untrue and there [is] abundant

and uncontroverted independent evidence that no discrimination had occurred.'" *Howard v. Coll. of the Albemarle*, 262 F. Supp. 3d 322, 332 (E.D.N.C. 2017) (quoting *Reeves*, 530 U.S. at 148).

In her Objections, Plaintiff asserts that she "has met her burden to proffer sufficient evidence of pretext to create a genuine issue of material fact." (ECF No. 52 at 3.) Plaintiff argues that the existence of pretext is obvious because the evidence establishes in the context of the two (2) reasons given for her termination that (1) Massey's performance evaluation was baseless and (2) Defendant utilized a subjective interpretation of the GBEA Policy as directed at Plaintiff versus other individuals. (*See, e.g.*, ECF Nos. 29-3 at 300–01, 29-8 at 76:20–23 ("Ms. West was terminated based on the information . . . provided from the audit as well as her performance evaluation."). *See generally* ECF No. 52.)

At the outset, the court observes that even though Superintendent Cook made the ultimate decision to terminate Plaintiff (*see* ECF No. 29-3 at 300–01), and his decision was upheld by the District's Board of Trustees (*id.* at 302), their actions cannot legalize a termination that was based on discriminatory reasons. *See Ludlum v. Sch. Dist. of Greenville Cty.*, 455 S.E.2d 177, 181 (S.C. Ct. App. 1995) ("The fact that the Superintendent and the Board reviewed the termination is simply another factor to be considered by the jury in determining the validity of [plaintiff's] retaliation claim. It would indeed be rare that a school board would engage in a retaliatory firing. Moreover, its approval of such a retaliatory firing by an employer does not have the effect of removing the taint of the firing.").

Defendant's first ground for Plaintiff's termination was an Athletic Director Evaluation submitted by NWHS Principal Massey on July 23, 2019. (ECF No. 29-3 at 282–86.) The court finds that because the resolution of the issue of pretext in the context of Plaintiff's evaluation requires weighing the credibility of witnesses, Defendant is not entitled to summary judgment.

*Atkins v. Comput. Sci. Corp.*, 264 F. Supp. 2d 404, 413 (E.D. Va. 2003) ("When the resolution of an issue is based on witness credibility, summary judgment is not appropriate. (citing *Gray v. Spillman*, 925 F.2d 90, 95 (4th Cir. 1991); *United States v. Burgos*, 94 F.3d 849, 868 (4th Cir. 1996))). More specifically, the court observes that Plaintiff's testimony, whether regarding Principal Massey's attendance at sporting events, financial support of sports teams, and/or choosing to support Coach Martin over Plaintiff, creates an inference that he had a sexist predisposition of supporting males, but not supporting females. *Cf. Weldon v. Kraft, Inc.*, 896 F.2d 793, 800 (3d Cir. 1990) ("[T]here is no rule of law that the testimony of a discrimination plaintiff, standing alone, can never make out a case of discrimination that could withstand a summary judgment motion. . . . For this reason, our legal system permits discrimination plaintiffs to prove their cases with circumstantial evidence." (citations omitted)). Moreover, Principal Massey's alleged sexist predisposition in conjunction with his failure to remember what date he learned that Plaintiff had voiced complaints about him to Dr. Campbell (*see* ECF No. 29-13 at 142:1–144:9), which occurred on March 26, 2019, creates a question of fact as to whether sexual animus affected Plaintiff's evaluation. *Weldon*, 896 F.2d at 800 ("The issue of pretext in this case turns largely on the credibility of the competing testimony. As such, it is inappropriate to decide on a motion for summary judgment."). As further support for this conclusion, the court notes that Principal Massey had not given a "needs improvement" evaluation to anyone other than Plaintiff. (ECF No. 29-8 at 86:19–87:4.)

Defendant's second ground supporting Plaintiff's termination is an audit report submitted on June 18, 2019, by the District's Internal Auditor Bettina Feaster. (*See* ECF No. 29-11 at 41–46.) The court finds that summary judgment as to pretext regarding this ground is also not appropriate due to the comparator evidence in the case. *See, e.g., Cole v. Family Dollar Stores of*

*Md., Inc.*, 811 F. App'x 168, 173 (4th Cir. 2020) ("Comparator evidence is useful in assessing pretext only when the comparator employees 'were similarly situated to the plaintiff (but for the protected characteristic).'" (quoting *Laing v. Fed. Express Corp.*, 703 F.3d 713, 719 (4th Cir. 2013))). The audit report contains a finding that Plaintiff had "authorized payments and acted in a supervisory role over her immediate family members, which is a violation of District Policy GBEA, Staff Ethics/Conflict of Interest." (*Id.* at 41.) Moreover, the audit report contains an observation that former Principal Blake had "a discussion with both Mr. and Mrs. West explaining nepotism and their approved roles as a means to help them maintain compliance while performing work within the District."[7] (*Id.* at 42.) With the audit report of NWHS, the District determined that the violation of the GBEA Policy as applied to Plaintiff warranted her termination. Ordinarily, a violation of policy is a legitimate reason for terminating an employee. *Laing*, 703 F.3d at 721. However, Plaintiff is the only employee of Defendant to have been fired for violation of the GBEA Policy. (ECF No. 29-8 at 94:12–15.)

The evidence in the record also demonstrates that two (2) other male Athletic Directors were subject to similar findings in audit reports, but the District chose not to terminate them. On September 25, 2019, Feaster submitted an audit report wherein she found that Bill Warren, the Athletic Director at Rock Hill High School ("RHHS"), and Eric Rollings, the Assistant Athletic Director at Rock Hill High School, had "acted in a supervisory role over their immediate family members, which is a violation of District Policy GBEA, Staff Ethics/Conflict of Interest." (ECF No. 29-11 at 47.) Feaster further observed in the audit report that "[i]n talks with Mr. Rollings and Mr. Warren, neither have had training on nepotism and they were unaware of the district's policy

---

[7] The court observes that Feaster did not recall how she got information regarding Principal Blake. (ECF No. 35-2 at 33:9–25.) Feaster did acknowledge that she never had access to Plaintiff's personnel file. (*Id.* at 34:1–13.)

against it . . . [and] it is recommended that all staff receive formal training on nepotism." (*Id.* at 48.)  With the audit of RHHS, the District found that a violation of the GBEA Policy as applied to Warren and Rollings warranted only a reminder regarding the existence of the GBEA Policy, training on the GBEA Policy that it did not conduct,[8] and an instruction to not engage in any further violations.  (ECF No. 29-8 at 94:3–10.)

The court is troubled by the District's position that no male who violated the GBEA Policy (i.e., Warren, Rollings, Plaintiff's husband) warranted the termination of his employment.  The issue should not be whether an employee had prior notice, especially when the information regarding how that notice (*i.e.*, Principal Blake's communications to Plaintiff) ended up in the audit creates an inference of retaliatory animus, but whether the District considers a violation of the GBEA Policy/State Ethics law warrants automatic termination.  *Cf. S.C. Wildlife & Marine Res. Dep't v. Kunkle*, 336 S.E.2d 468, 469 (S.C. 1985) ( "[I]t is a well-settled maxim that ignorance of the law is no excuse.") (citation omitted).  In light of the aforementioned comparator evidence, the court is persuaded that a jury should consider whether the second reason for Plaintiff's termination was pretextual for discriminatory conduct.  *E.g.*, *Laing*, 703 F.3d at 721 ("Significantly, [plaintiff] has not identified any similarly situated [] employee—that is, an employee accused of violating the same company policy but  . . . who was given more favorable treatment.  Such comparator evidence, of course, would be 'especially relevant' to a showing of pretext, but [plaintiff] has none." (citing *McDonnell Douglas*, 411 U.S. at 804)).

Therefore, upon consideration of the foregoing, the court is persuaded that Plaintiff has produced evidence that would permit a reasonable factfinder to conclude that Defendant's

---

[8] Warren testified that the District did not provide him training on the GBEA Policy. (*See* ECF No. 29-14 at 81:23–82:3.)   Adam Hare, the Athletic Director at South Pointe High School, also stated that he did not receive training on the GBEA Policy.  (ECF No. 35-6 at 20:16–25.)

legitimate, non-discriminatory reason was a pretext for discrimination on the basis of sex and/or retaliation.

  2. *Mixed Motive*

In her Objections, Plaintiff asserts that the Magistrate Judge ignored the following evidence demonstrating that "sex was a motivating factor in [Plaintiff's] termination":

> [M]en in the same position were treated more favorably than Plaintiff, evaluated differently than Plaintiff, allowed to break rules Plaintiff was not allowed to break, subjected to less scrutiny and fewer requirements than Plaintiff; that the allegations lodged against Plaintiff in her evaluation are shown to be false by the independent third party testimony and evidence; that Defendant changed its own interpretation and enforcement of policies in order to develop excuses for Plaintiff's termination; and that Plaintiff was replaced by a man who was thereafter treated better than Plaintiff by the same set of supervisors.

(ECF No. 52 at 20–21.)

Upon review, the court observes that because Plaintiff has adduced sufficient evidence to sustain her sex discrimination claim under the *McDonnell Douglas Corp.* burden-shifting standard, the court does not need to analyze her discrimination claim under a mixed-motive theory of liability. *E.g.*, *May v. PNC Bank*, 434 F. Supp. 3d 284, 296 (E.D. Pa. 2020) ("To the extent that the Court finds Ms. May has met her burden under the pretext theory with respect to any of her claims to which the burden-shifting framework applies, the Court need not address whether Ms. May has done so with respect to those claims brought pursuant to the mixed-motive theory."); *Jordan v. Tex. Dep't of Aging & Disabilities Servs.*, Civil Action No. 9:05CV161, 2006 WL 1804619, at *8 (E.D. Tex. June 28, 2006) ("Because the court concludes that Plaintiff has shown pretext, the court does not need to address Plaintiff's arguments under the mixed-motive framework.").

## V.    CONCLUSION

Upon careful consideration of the entire record, the court hereby **SUSTAINS** Plaintiff

Lauren Massey West's Objections (ECF No. 52) and **DENIES** the Motion for Summary Judgment of Defendant Rock Hill School District Three (ECF No. 29).  The court will conduct a jury trial on Plaintiff's claims for sex discrimination and retaliation in violation of Title VII of the Civil Rights Act of 1964.  The court **REJECTS** the recommendation in the Magistrate Judge's Report and Recommendation (ECF No. 48) but incorporates all remaining aspects herein by reference.

      **IT IS SO ORDERED.**


J. Michelle Childs

United States District Judge

March 31, 2022
Columbia, South Carolina